1  EDWARD M. GERGOSIAN (105679)
   ROBERT J. GRALEWSKI, JR. (196410)
2  CLARISSA E. RILEY (239628)
   GERGOSIAN & GRALEWSKI LLP
3  655 West Broadway, Suite 1410
   San Diego, CA 92101
4  Telephone: (619) 237-9500
   Facsimile: (619) 237-9555
5
   HEINS MILLS & OLSON, PLC
6  VINCENT J. ESADES
   SCOTT W. CARLSON
7  3550 IDS Center
   80 South 8th Street
8  Minneapolis, MN
   Tel: (612) 338-4605
9  Fax: (612) 338-4692
10 CHRISTIAN SANDE LLC
   CHRISTIAN M. SANDE, #026474X
11 2751 Hennepin Avenue South, No. 232
   Minneapolis, MN 55408
12 Tel: (612) 387-1430
   Fax: (612) 677-3078
13
   Attorneys for Plaintiff
14
15              UNITED STATES DISTRICT COURT

16              SOUTHERN DISTRICT OF CALIFORNIA

17 WILLIAM R. JAWORSKI, d/b/a GREAT       Case No. '07 CV  2103   L (AJB)
   NORTHERN ENGINEERING, on behalf of
18 himself and all others similarly situated,    CLASS ACTION

19              Plaintiff,                         COMPLAINT

20 v.                                             JURY TRIAL DEMANDED

21 ARKANSAS BEST CORPORATION,
   ABF FREIGHT SYSTEM, INC.,
22 AVERITT EXPRESS, INC., CON-WAY
   INC., CON-WAY FREIGHT INC., ESTES
23 EXPRESS LINES, FEDEX
   CORPORATION, OLD DOMINION
24 FREIGHT LINE, INC., SAIA, INC., SAIA
   MOTOR FREIGHT LINE LLC, UNITED
25 PARCEL SERVICE, INC., and YRC
   WORLDWIDE, INC.,
26
                Defendant.
27
28

                          COMPLAINT

1    William R. Jaworksi, d/b/a Great Northern Engineering ("Plaintiff"), by and through his

2  undersigned counsel, complains and alleges upon information and belief except as to those

3  paragraphs applicable to Plaintiff individually, which are based upon personal knowledge.

4  Plaintiff brings this action individually and on a behalf of a class of all those similarly situated,

5  as defined below, seeking treble damages and injunctive relief under the antitrust laws of the

6  United States against Defendants Arkansas Best Corporation, ABF Freight System, Inc., Averitt

7  Express, Inc., Con-way Inc., Con-way Freight Inc., Estes Express Lines, FedEx Corporation,

8  Old Dominion Freight Line, Inc., Saia, Inc., Saia Motor Freight Line LLC, United Parcel

9  Service, Inc., and YRC Worldwide, Inc. (collectively "Defendants"), and alleges as follows.

10                              **NATURE OF THE ACTION**

11    1.    This antitrust class action charges that the Defendant companies – the nation's

12  leading less-than-truckload ("LTL") carriers – have engaged in price fixing in violation of

13  Section 1 (15 U.S.C. § 1) of the Sherman Antitrust Act of 1890 (the "Sherman Act").

14    2.    Plaintiff brings this action on behalf of himself and a class of entities who

15  purchased LTL freight transportation services from Defendants and their co-conspirators from

16  September 7, 2003 to the present (the "Class Period") and who were assessed a so-called "fuel

17  surcharge" for the agreed-upon LTL freight transportation services (hereinafter "LTL Fuel

18  Surcharge").

19    3.    During the Class Period, and possibly before, Defendants conspired to fix, raise,

20  maintain, and/or stabilize prices of LTL Fuel Surcharges added to customers' bills.

21    4.    Defendants agreed with each other to charge LTL Fuel Surcharges to customers

22  and to compute them in a common manner.  Defendants portrayed LTL Fuel Surcharges to

23  customers as fees necessary to recoup unexpected fuel cost increases.  However, pursuant to

24  their agreement, Defendants were able to employ LTL Fuel Surcharges as revenue generators

25  and profit centers.

26    5.    Pursuant to their agreement, Defendants were able to maintain an appearance of

27  competing on LTL freight shipment rates, while using LTL Fuel Surcharges as revenue

28  enhancement measures shielded from normal competitive forces.

1

COMPLAINT

6.      Defendants agreed to – and did in fact – set and compute their LTL Fuel Surcharges as a percentage of their customers' base rates and used common indices, timing, and trigger points for adjusting their percentages. In this manner, Defendants were able to maintain uniformity of the LTL Fuel Surcharges they charged their customers during the Class Period.

7.      As a direct and proximate result of this price-fixing conspiracy, Defendants have restrained competition among LTL freight transportation services and injured Plaintiff and the members of the class in their business and property. Plaintiff, and the other members of the class, paid a higher price for LTL Fuel Surcharges and LTL freight transportation services than would have been paid absent the concerted unlawful conduct alleged herein.

**PARTIES**

8.      Plaintiff William R. Jaworski, d/b/a Great Northern Engineering, ("Plaintiff") is a sole proprietorship with his principal place of business in the State of Minnesota. Great Northern Engineering is engaged in the manufacture of spas and hot tubs under the trade name of Great Northern Spas and Hot Tubs. During the Class Period, Plaintiff purchased LTL freight transportation services directly from one or more Defendants and was assessed an LTL Fuel Surcharge.

9.      Defendant Arkansas Best Corporation ("ABC") is a company incorporated in Delaware and engaged, through its subsidiaries, in motor carrier transportation operations. ABC offers LTL freight transportation services through its wholly-owned subsidiaries, including ABF Freight System, Inc., ABF Freight System Canada, ABF Cartage, Land-Marine Cargo, and FreightValue, Inc. Defendant ABF Freight System, Inc. ("ABF"), also incorporated in Delaware, is the largest subsidiary of ABC, accounting for 97.3% of ABC's revenues for 2006. ABF is one of North America's largest LTL motor carriers and provides direct service to over 97% of the cities in the United States having a population of 25,000 or more. ABC and ABF's headquarters are at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903.

10.      Defendant Averitt Express, Inc. ("Averitt") is a privately-held LTL company incorporated in Tennessee with most of its operations concentrated in the southeastern United States. Averitt's headquarters are located at Perimeter Place One, 1415 Neal Street, Cookeville,

1    Tennessee 38502.

2    11.    Defendant Con-Way Inc. and its subsidiaries and business segments provide

3    transportation, logistics, and supply-chain management services for a range of manufacturing,

4    industrial, and retail customers.  Con-way Inc. is incorporated in Delaware.  In April of 2006,

5    shareholders approved management's proposal to change the company's name from "CNF Inc."

6    to "Con-way Inc."  Company headquarters are at 2855 Campus Drive, Suite 300, San Mateo,

7    California 94403.

8    12.    Defendant Con-way Freight Inc. is a national LTL freight transportation

9    company and subsidiary of Con-way Inc., incorporated in Delaware.  On August 22, 2007, the

10    company announced that it was consolidating its three regional LTL operating companies –

11    Con-way Freight-Central, Con-way Freight Southern, and Con-way Freight-Western – into a

12    single centralized operation headquartered in Ann Arbor, Michigan, at 110 Parkland Plaza, Ann

13    Arbor, Michigan 48103.  Con-way Inc. and Con-way Freight Inc. will be collectively referred to

14    herein as "Con-way."

15    13.    Estes Express Lines ("Estes") is a privately held company and one of the nation's

16    largest regional LTL trucking companies, covering all regions of the United States.  Estes is

17    incorporated in Virginia, with its principal place of business at 3901 West Broad Street,

18    Richmond, Virginia 23230.

19    14.    Defendant FedEx Corporation ("FedEx") provides packaging, shipping, and

20    freight services, including LTL services, among other business lines.  FedEx operates in the

21    LTL segment in the United States primarily through FedEx Freight and FedEx National LTL.

22    In September of 2006, FedEx purchased the LTL operations of Watkins Motor Lines and certain

23    affiliates.  FedEx is a Delaware corporation with headquarters at 942 South Shady Grove Road,

24    Memphis, Tennessee 38120.

25    15.    Defendant Old Dominion Freight Line, Inc. ("Old Dominion") is a Virginia

26    corporation and a multi-regional LTL carrier which provides one to five-day service within five

27    regions of the United States.  Old Dominion's headquarters are located at 500 Old Dominion

28    Way, Thomasville, North Carolina 27360.

16.    Defendant Saia, Inc. ("Saia") is a trucking transportation company incorporated in Delaware. Saia was organized in 2000 as a wholly-owned subsidiary of Yellow Corporation, now known as YRC Worldwide, and was spun-off to become an independent public company on September 30, 2002. On June 30, 2006, Saia sold the outstanding stock of Jevic Transporation, Inc. ("Jevic"), its hybrid LTL and truckload carrier to a private investment firm. Saia now operates as a single segment company with one operating subsidiary, Defendant Saia Motor Freight Line LLC, offering national, interregional, and regional LTL services. Saia's headquarters are located at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia 30097. Saia and Saia Motor Freight Line LLC will be collectively referred to herein as "Saia."

17.    Defendant United Parcel Service, Inc. ("UPS") is a freight, package delivery, and supply chain management company incorporated in Delaware. In 2005, UPS entered the LTL market by acquiring the assets of Overnight Transportation Company, then one of the largest LTL companies operating in the United States. UPS headquarters are located at 55 Glendale Parkway, NE, Atlanta, Georgia 30328.

18.    Defendant YRC Worldwide, Inc. ("YRC") is a Fortune 500 trucking company incorporated in Delaware providing national LTL services and other freight services using its own name and several other brands, including Yellow Transportation, Inc. and Roadway Express, Inc. YRC's headquarters are located at 10990 Roe Avenue, Overland Park, Kansas 66211.

## JURISDICTION AND VENUE

19.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover treble damages, injunctive relief, and costs of suit, including reasonable attorneys' fees, as the result of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

20.    Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

21.    Venue is proper in this district pursuant 28 U.S.C. § 1391(b) and (c) and by Section 12 of the Clayton Act, 15 U.S.C. § 22.

1      22. Defendants maintain offices, have agents, or transact business within this judicial

2    District, a substantial part of the events giving rise to the claim for relief occurred in this

3    District, and Defendants regularly and continuously conduct business in interstate commerce

4    that is carried out in part in this District.

5      23. This Court has personal jurisdiction over Defendants because, *inter alia*, each

6    Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered

7    LTL freight transportation services in this District; (c) has substantial aggregate contacts with

8    this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had

9    the intended effect of causing injury to, persons and entities residing in, located in, or doing

10   business in this District.

11            **CLASS ACTION ALLEGATIONS**

12     24. Plaintiff brings this action on behalf of himself and all others similarly situated

13   (the "Class") pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3).  The

14   Class is defined as follows:

15       All purchasers of LTL freight transportation services from
    Defendants who paid an LTL Fuel Surcharge, at any time from at
16       least as early as September 7, 2003 to the present (the "Class
    Period").    Excluded from the Class are Defendants, any
17       subsidiaries or affiliates of Defendants, any of Defendants' co-
    conspirators, whether or not named as a Defendant in this
18       Complaint, and all governmental entities (the "Class").

19     25. Plaintiff does not know the exact size of the Class, since such information is in

20   the exclusive control of Defendants.  Due to the nature of the trade and commerce involved,

21   Plaintiff believes that the Class is so numerous and geographically dispersed throughout the

22   United States as to render joinder of all Class members impracticable.  Class members are

23   identifiable from information and records in the possession of Defendants.

24     26. Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff

25   and all members of the Class were injured by the same wrongful conduct by Defendants and

26   suffered damages as a result.

27

28

27. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is represented by counsel experienced and competent in the prosecution of complex litigation, including class actions and antitrust litigation.

28. Questions of law or fact common to the Class include:

a. Whether Defendants conspired or combined for the purpose of and with the effect of fixing, maintaining, or stabilizing the price of LTL Fuel Surcharges applied to LTL freight transportation services purchased by the Class;

b. Whether Defendants' conduct violated the federal antitrust laws; and

c. Whether Defendants' conduct caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

29. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

30. Class action treatment is the superior method for the fair and efficient adjudication of this controversy because, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh the difficulties, if any, that may arise in management of this class action.

## FACTUAL ALLEGATIONS
### Less-Than-Truckload Market Sector

31. According to a March 2007 statement issued by the American Trucking Associations, Inc. ("ATA"), the trucking system hauls 69% of the nation's freight by volume and 84% by revenue. Trucking revenue accounts for $623 billion of the nation's economy with other transportation modes combined accounting for $116 billion. Trucks provide transportation services to virtually every other industry operating in the United States. Even

1    freight carried by other modes depends on trucking to provide access to air cargo, railroad, and
2    seaport terminals.

3        32.    Three major lines of division exist within the trucking industry. One is between
4    long haul and short haul: *i.e.*, between companies that provide primarily intercity services and
5    companies that provide service within a metropolitan region and its outlying areas and perhaps
6    to nearby cities. Second, there is a division between the for-hire and private-carriage segments.
7    The former refers to firms that move the goods of others for payment – what is typically
8    considered to be the "trucking industry." The latter refers to firms that use their own trucks and
9    drivers to move their own goods.

10       33.    The third major line of division is within the for-hire segment: truckload ("TL")
11   and less-than-truckload ("LTL") shipping. TL carriers move shipments – a full truckload of
12   goods or close to it – directly from origin to destination. LTL carriers consolidate, haul, and
13   distribute goods through a network of terminals in less-than-truckload lots. TL carriers
14   generally transport shipments greater than 10,000 pounds, while LTL carriers transport
15   shipments less than 10,000 pounds. Typically, an LTL operation collects small shipments from
16   local pick-ups, moves them over the road between terminals in truckloads, and breaks them up
17   at the destination terminal, where it makes local deliveries.

18       34.    The LTL market segments contrasts with the TL market segment both in mode of
19   operation and degree of concentration. There are approximately 53,000 TL firms, and a
20   substantial share of total TL revenue is with small and middle-sized TL firms. In the LTL
21   market sector, which has become increasingly concentrated, there are less than 1,000 firms total,
22   and a relatively small number – essentially the Defendants here – account for the great majority
23   of the business. In 2005, the LTL market had approximately $45 billion in total revenue.

24       35.    In order to operate its business, whether regional or national, an LTL firm
25   requires a set of terminals. Each terminal will have a force of pick-up and delivery drivers.
26   Typically, they go out in the morning with loaded trucks, make deliveries, spend the afternoon
27   picking up loads, and return to the terminal at the end of the day with outbound loads.

28

36.    For the national LTL firms – those that provide long-haul service and have average lengths of haul in excess of 1,000 miles – the operation is somewhat more complicated. These companies have a set of major hub terminals, each of which has a larger number of satellite terminals. Line-haul moves will often be from satellite to hub to hub to satellite. In some circumstances, a trailer may go directly from a satellite to a hub in another region. Where the line haul is more than 500 miles, moves are frequently handled either in teams or relays.

37.    The Defendants in this case include all the national LTL carriers and the dominant regional or "super-regional" LTL carriers.

### Deregulation of the Trucking Industry

38.    Over the last 70 years, the motor carrier industry, including the trucking industry, has been through nearly a full regulatory cycle – from being relatively deregulated to being subject to pervasive regulation to, again, near total deregulation. Since extensive regulation ended well over a decade ago, the revitalization of the trucking industry has demonstrated the benefits of competition. However, in certain sectors, such as the LTL industry, anticompetitive practices have occurred.

39.    Trucking regulation dates to passage of the National Industrial Recovery Act ("NIRA") in 1933 (Ch. 90, 48 Stat. 195 (1933)), which replaced free market competition with cooperative action subject to regulatory oversight. NIRA was a New Deal measure passed in light of the Great Depression's effect on the ability of many American industries to earn compensatory revenues. It was intended to stabilize the economy through promotion of "codes of fair competition" and the standardization of certain business practices. The code governing the motor carrier industry, developed by the new motor carrier rate bureaus, required that each carrier file a schedule of minimum rates and tariffs.

40.    After the NIRA was struck down by the United States Supreme Court, Congress passed the Motor Carrier Act of 1935 (Ch. 48, 49 Stat. 543 (1935)) (the "1935 Act"), which initiated a system under which the Interstate Commerce Commission ("ICC") restricted new entry into the trucking business and approved specific routes. The 1935 Act also required motor carriers to file tariffs with the ICC 30 days in advance, allowed protest from other common

1    carriers of a proposed tariff, and required that the carriers' rates be reasonable "as to both

2    minimum and maximum." The underlying rationale of the 1935 Act was that the motor carrier

3    sector was economically unstable and that cut-throat competition might destroy the fledgling

4    industry.

5        41.    In 1948, with the motor carrier industry facing antitrust lawsuits and

6    investigations by the U.S. Department of Justice and several states regarding collective activity,

7    Congress passed the Reed-Bullwinkle Act (Pub. L. No. 80-662, 62 Stat. 472 (1948)). That act

8    allowed rate-bureaus operating under ICC-approved agreements to set rates collectively, and it

9    immunized the activities of bureaus operating under an ICC-approved agreement from the

10   antitrust laws.

11       42.    In the environment of pervasive regulation, almost all carriers belonged to a rate

12   bureau. Most carriers paid the class rates the bureaus set and published for their member

13   carriers. All rates were subject to regulatory challenge.

14       43.    As the interstate highway system was built and trucks, rather than railroads,

15   came to dominate the carriage of manufactured goods, the motor carrier industry achieved

16   financial stability and the original rationale for restrictive motor carrier regulation ceased to

17   exist. A significant turning point was the 1980 Motor Carrier Act (the "1980 Act") (Pub. L. No.

18   96-296, 94 Stat. 293 (1980)), in which Congress essentially repealed interstate motor carrier

19   regulation in order to promote competition. The 1980 Act curtailed the permissible activities of

20   rate bureaus seeking continued regulatory approval. Among other things, the Act prohibited

21   bureaus and their members from interfering with any carrier's right to publish its own rates.

22       44.    In 1994, in the Trucking Industry Regulatory Reform Act (Pub. L. No. 103-311,

23   108 Stat. 1683 (1994)), Congress removed the requirement that motor carriers of general freight

24   file tariffs.

25       45.    In the ICC Termination Act of 1995 ("ICCTA") (Pub. L. No. 104-88, 109 Stat.

26   803 (1995)), Congress removed most of the remaining framework of pervasive regulation in

27   favor of encouraging robust competition. It eliminated regulation of motor carrier rates

28   altogether, except for rates for household goods movements, rates for joint motor-water

1    movements in noncontiguous domestic trade, and rates set collectively by motor carrier bureaus.

2    Congress also mandated a periodic review of existing motor carrier bureau agreements by the

3    successor to the ICC, the Surface Transportation Board ("STB"), under a "public interest"

4    standard.

5          46.    Following the ICCTA, several motor carrier bureaus with STB-approved

6    agreements continued to exist.  One of these bureaus, the National Classification Committee

7    ("NCC"), comprised of motor carrier members, establishes freight commodity classifications.

8    The NCC assigns to each commodity a numerical "rating" based on four transportation

9    characteristics – density, stowability, ease of handling, and liability for breakage or loss.  Other

10    bureaus, called "rate bureaus," acting independently of NCC, then develop collective rates

11    (referred to as "class rates") based on the classification ratings developed by the NCC and other

12    movement characteristics.  The rate bureaus, which are regional, include the Middlewest Motor

13    Freight Bureau, the Rocky Mountain Tariff Bureau, the Southern Motor Carriers Rate

14    Conference, and the New England Motor Rate Bureau.  These and other rate bureaus have

15    entered into agreements – eleven in number – that have been approved by the STB until this

16    year and that allowed them to conduct various activities pursuant to those agreements.

17          47.    Prior to the reforms of the 1980 Act and the ICCTA, shippers were far more

18    likely to be charged class rates set by rate bureaus.  After passage of these acts, the carriers who

19    continued to use the class rate system usually applied significant discounts to the class rates.

20    For those carriers and the shippers that use them, the class rates serve as a baseline rate.  Rate

21    bureaus also compute general rate increases ("GRIs") for their members.  The activities of STB-

22    approved rate bureaus to set class rates and compute GRIs have had limited immunity from the

23    antitrust laws.  However, notwithstanding this limited immunity, even motor carriers

24    participating in motor carrier rate bureaus have not had immunity to agree on the actual rates

25    that they will charge.

26          48.    Recently, in two Decisions served on May 7, 2007, the STB terminated its

27    approval of the NCC and the regional motor carrier rate bureaus, finding that they were not in

28

1  the public interest.  It declined to reapprove the eleven agreements mentioned above.  The

2  bureaus have filed an appeal of this decision.

3      49.    The limited antitrust immunity given (until recently) to the NCC and the regional

4  rate bureaus did not and does not apply to the conduct challenged in this case.  Following

5  passage of the ICCTA, many trucking companies – particularly the large carriers such as the

6  Defendants here – set their rates individually, according to their own costs and market

7  conditions.  Thus, no antitrust immunity applied to the rates set or charged by these companies.

8  Additionally, the LTL Fuel Surcharges imposed by the Defendants were not the result of any

9  STB-approved collective rate-making activities.  Instead, they were the result of fuel surcharge

10  programs instituted by the Defendants, which were purportedly individual cost-recoupment

11  measures, but were actually the result of concerted conduct to which no antitrust immunity

12  applies.

13                          **The LTL Fuel Surcharge Conspiracy**

14      50.    Fuel surcharges in the LTL industry were instituted in the early-to-mid 1990s.

15  They initially met with limited success for several reasons.  First, the surcharges imposed in this

16  earlier period, unlike those imposed more recently, varied significantly from carrier to carrier.

17  Second, in the more recent period, LTL carriers have been successful in having fuel charges

18  distinguished from base freight rates and stated as a percentage of the cost of the base freight

19  rate per mile (something that TL carriers typically do not do).  Finally, increasing concentration

20  in the LTL industry afforded those who remain the ability to collude to impose fuel surcharges

21  successfully.  As one report from 2006 noted, quoting Donald Broughton, an analyst for A.G.

22  Edwards & Sons: "[a]nalyst Broughton says the reason carriers have been so successful in

23  getting what they're asking for is that they have been unified in seeking the charges. 'I

24  remember carriers asking for fuel surcharges in the early 1990s, but shippers could route around

25  those guys and find one who didn't have surcharges. But all those carriers who didn't ask for

26  fuel surcharges in the early 1990s are gone,' he observes."  Mr. Broughton had made a similar

27  point as early as January of 2003:  "'The industry as a whole has gotten markedly better at

28  recovering fuel surcharges,' Broughton says. 'Those that were really bad at recouping fuel

1   expenses aren't in business anymore.'" Similarly, Robert Costello, the chief economist at the

2   ATA, was quoted in a 2005 article, "'[i]t appears that so-called fuel surcharges have become

3   more prevalent over the last year or so,' Costello says.  This is a switch from the 2000 crisis,

4   when many shippers refused to pay fuel surcharges."

5        51.     By 2003, the LTL industry had consolidated to the point where collusion on fuel

6   surcharges presented to the major players an attractive means by which to boost revenue.  No

7   new entrant of note had entered the market since 1990.  The only new names entering the

8   market did so by purchasing existing companies.  Of the 60 leading, name-brand trucking firms

9   in operation in North America in 1983, very few were left by 2003 and just six were left in

10  2006.

11       52.     By 2003, Defendants were also faced with the potential effects of the STB's

12  increased scrutiny of regional rate bureaus and the NCC on the elevated price baselines in the

13  LTL market as a whole.

14       53.     Increased fuel costs in late 2002 and 2003 presented an opportunity for

15  Defendants to collude to generate a revenue source that would largely be immune from

16  competitive pressures on industry rates.

17       54.     Beginning in or around 2003, Defendants conspiratorially implemented LTL

18  Fuel Surcharge programs which, although presented as individual cost-recoupment measures,

19  allowed Defendants to boost revenues by generating profits shielded from competition.

20       55.     Defendants implemented their agreement by exchanging information both in

21  private and by publicly announcing agreed-upon surcharge increases and posting fuel surcharge

22  percentages on their websites.  This allowed Defendants to monitor and enforce the agreed-upon

23  LTL Fuel Surcharge levels.

24       56.     Defendants' choice of a common index, common trigger points for adjustment,

25  and a common methodology are all evidence of the fact that Defendants' LTL Fuel Surcharge

26  programs were the result of concerted, rather than unilateral, conduct.  As one industry analyst

27  observed, "despite different LTL carriers having very different operational characteristics and

28  economies, they invariably set nearly identical fuel surcharge levels."

57.   The LTL Fuel Surcharges were not intended to be cost-recoupment measures. Instead, pursuant to their unlawful agreement, Defendants set and computed their LTL Fuel Surcharges as a percentage of their customers' base rate and used common indices, timing, and trigger points for adjusting their percentages – typically computing a 0.5% surcharge for every five-cent increase in the U.S. National Average Diesel Fuel Index published weekly by the Energy Information Administration of the United States Department of Energy.   Defendants' own websites demonstrate the uniformity of the surcharge computation they have utilized in recent years.   In this collusive manner, Defendants were able to maintain uniformity, or near uniformity, of the LTL Fuel Surcharges they charged their customers during the Class Period.

58.   By agreeing to compute LTL Fuel Surcharges as a percentage of a customer's base rate, Defendants were ensuring that the LTL Fuel Surcharges would not correlate to any actual increase in the cost of fuel, but could be used as revenue generators and profit centers. Freight rates consist of fixed and variable costs, as well as profit.   Setting a "fuel surcharge" as a percentage of these different variables allowed Defendants to collect a fuel surcharge under certain circumstances exceeding their entire cost of fuel.   A percentage-based fuel surcharge also allowed Defendants to compound any rate increase they were able to achieve.

59.   Defendants' conspiratorial practices in this regard were undertaken for purposes of maximizing revenue and profit and without true regard to fuel prices as an element of their costs. As a report prepared in 2006 for the Analysis Division of the Office of Research and Analysis of the Federal Motor Carrier Safety Administration ("FMCSA") noted, there was a transitory spike in diesel fuel spot prices in the third quarter of 2005 due to Hurricane Katrina, but "[t]he change in fuel prices has had a much more negative effect on truckload (TL) carriers than on less-than-truckload (LTL) carriers.   Estimates by Standard and Poor's are that total fuel costs for TL carriers will increase from approximately 13.5 percent of revenues in 2004 to 16.5 percent in 2005.   This is a substantial increase in an industry that has historically been able to generate extremely small profit margins.   **LTL carriers, on the other hand, have seen fuel costs remain constant at about 7 percent of revenues.**"   (Footnotes omitted; emphases added.)

1    60.    Diesel fuel prices peaked again in 2006, but again also rapidly subsided.  By July

2  of 2007, the ATA reported that the national average price for on-highway diesel fuel was 6.9

3  cents less than it had been during the comparable period in 2006. Yet prior to its July 23, 2007

4  decision to cut LTL Fuel Surcharges by 25%, FedEx's LTL Fuel Surcharge, like those of its

5  rivals, was hovering near 20%.   Defendants knew they were setting LTL Fuel Surcharges

6  without regard to their actual fuel costs.   As James Hudson, Corporate Vice-President of

7  Strategic Planning & Analysis for FedEx, noted at a conference held by Bear Stearns & Co.,

8  Inc. ("Bear Stearns") in 2006, "it is increasingly difficult for all of us to really track and

9  understand exactly what is going on with fuel surcharges versus fuel costs."

10                          **Success of the Conspiracy**

11    61.    Defendants charged virtually identical fuel surcharges during the Class Period.

12    62.    As noted above, Defendants were successful in imposing conspiratorially LTL

13  Fuel Surcharges on their customers during this period because they were "unified" in seeking

14  the charges.

15    63.    Industry analysts observed that large LTL carriers (*i.e.*, the Defendants) were

16  more successful during this period in imposing fuel surcharges than their TL counterparts.  TL

17  carriers are generally more affected than LTL carriers by increases in the price of diesel fuel, as

18  total fuel costs are a significantly higher percentage of revenues for TL carriers than for LTL

19  carriers, and thus TL operators would be expected to have a greater need for fuel surcharges

20  than LTL operators.

21    64.    By 2005, Defendants' concerted LTL Fuel Surcharge programs were enabling

22  them to obtain record profits and profit margins. For example, despite Hurricanes Katrina and

23  Rita, which dampened freight demand along the Gulf Coast and led to transitorily high fuel

24  prices nationwide, certain Defendants had record third quarters in 2005.   Defendant Old

25  Dominion, for example, saw substantial growth in revenue, and new records in net income and

26  earnings per share, and achieved the lowest operating ratio and highest profit margins in its 14

27  years as a public company.   Defendant YRC also reported soaring earnings and revenues.

28  Defendant Con-Way reported gains in income and revenue, although it noted that its yields

1    would have dropped if not buoyed by its fuel surcharge program. Even Defendant Saia, which

2    took a direct hit on its service territory from both Katrina and Rita – which caused temporary

3    service shutdowns – saw operating income and revenues soar.

4         65.    These facts indicate that Defendants were able to pass essentially the entire

5    increases of fuel prices – and in some cases much more – along to their customers, even as fuel

6    surcharges amounted to 20% or more of a customer's bill. This is further evidence that the LTL

7    Fuel Surcharge programs were the product of concerted action, as in a competitive environment

8    carriers and shippers would share the effects of fuel cost increases.

9         66.    Defendants' concerted LTL Fuel Surcharge programs were profit centers.

10   Industry analysts increasingly have begun to observe that, due to their surcharge programs,

11   Defendants *benefit* from higher diesel fuel costs. For example, analysts at Bear Stearns

12   concluded in a recent report that "lower diesel fuel prices would create a headwind for LTL

13   carriers as … it would lead to lower overall fuel surcharge income." These analysts also have

14   noted that: "Our sense is that generally the LTL carriers make money on fuel surcharges, and

15   that earnings for LTL providers would be hurt by sustained lower fuel costs." An analyst at SJ

16   Consulting made a similar point:    "'[t]hese additional revenues contribute substantially to

17   operating profits after fuel expense....'" And Fitch Ratings, another industry analyst, has been

18   reported as stating: "[f]uel surcharges have become key in shipping prices, with surcharges

19   accounting for more than 50 percent of some trucking firms' unit revenue increases."

20        67.    Defendants themselves have increasingly admitted that their LTL Fuel Surcharge

21   programs have served as profit generators and not cost-recoupment measures. For example,

22   Defendant Con-Way noted in its 2005 annual report that "Con-Way's operating income would

23   likely be adversely affected by a rapid and significant decline in fuel prices as lower fuel

24   surcharges would reduce Con-Way's yield and revenue."

25        68.    Defendant Old Dominion stated in its 2006 annual report, "[a] rapid and

26   significant decrease in diesel fuel prices would likely reduce our revenue and operating income

27   until we revised our pricing strategy to reflect these changes."

28

69.    Defendant YRC stated: "[i]n general, under our present fuel surcharge program, we believe rising fuel costs are beneficial to us in the short term."

70.    Defendant ABF stated: "[a]s diesel fuel prices decline, the fuel surcharge and associated direct diesel fuel costs also decline by different degrees. Depending upon the rates of these declines and the impact on costs in other fuel and energy-related areas, operating margins could be negatively impacted."

71.    Defendant FedEx noted that, for its FedEx Freight LTL service, "in 2006, fuel surcharges more than offset the effect of higher costs."

72.    In its 2004 annual report, SCS Transportation ("SCS"), then the parent of Saia and Jevic) disclosed that in 2003 higher fuel prices (exclusive of taxes), in conjunction with volume changes, caused a $10.6 million increase in its operating expenses and supplies. However, that same year SCS obtained nearly $30 million from its customers in "fuel surcharge" revenue, which was $14.7 million higher than the previous year.

73.    These facts further evince the disruption of competitive forces in the LTL sector. Given that fuel surcharges were serving as substantial profit centers, in a competitive market one would expect a company to pursue greater market share by offering a more competitive fuel surcharge program to customers.

74.    However, despite customer complaints, no Defendant made any attempt to offer a more competitive LTL Fuel Surcharge Program until July of 2007, when growing public concerns about Defendants' Fuel Surcharge programs may have begun to loosen the adherence of Defendants to their conspiratorial agreement. On July 23, 2007, FedEx Freight announced that it was reducing its standard LTL fuel surcharge by 25%, in an effort Douglas G. Duncan, president and CEO of FedEx Freight, stated was intended to "drive a little more market share." As Mr. Duncan was quoted in one report: "'This is a complete reduction that goes up and down the scale and higher.... The trucking economy has not been all that stellar in the last few months, and the imposition of fuel surcharges – as high as they have gotten – have become a real problem for customers trying to run their business and budget to anticipate what is going to happen in the future. As we looked to see where we could have the most impact and offer the

16

1    most help to our customers, we clearly thought the fuel surcharge was the place to do it." In a

2    truly competitive industry, FedEx (and/or other Defendants) would have taken this step much

3    earlier. Its failure to do so, and its acknowledgment that nothing prevented it from doing so,

4    bespeaks the collusion that has existed in the LTL trucking sector.

5        75.    Industry analysts have observed that FedEx's action – which would be expected

6    in a truly competitive market – did not occur during the Class Period. Bear Stearns analysts

7    noted, for example, that the fuel surcharge reduction is "the most overt sign of price competition

8    in the LTL market **since the mid 1990s.**" (Emphases added.) In a competitive market, such an

9    obvious and effective method of responding to customers and gaining market share would not

10   have been disregarded for so long.

11       76.    As noted above, the utilization of LTL Fuel Surcharges in the manner in which

12   they are currently and collusively employed dates from at least 2003. Defendants' agreement to

13   use such surcharges may have been reached at industry meetings held under the auspices of the

14   National Motor Freight Traffic Association, Inc. ("NMFTA"). The following Defendants

15   (including related entities) were all members of the NMFTA: ABF Freight System, Inc., Averitt

16   Express, Con-Way, Estes Express Lines, FedEx Freight, FedEx National LTL, Old Dominion

17   Freight Lines, Roadway Express, UPS Freight, and Yellow Transportation, Inc.

18       77.    The NMFTA is the parent entity of the NCC – the motor bureau which classifies

19   freight for use with LTL rate schedules. Members of the NMFTA hold meetings at least four

20   times a year where industry issues are discussed; its most recent meeting was in Arlington,

21   Virginia from September 29 through October 2, 2007. Additionally, acting through its member

22   carriers (including Defendants), the NCC initiates classification review matters, which may

23   often lead to research investigations and to proposals for changes in classification. The NCC

24   assigns the research task to NMFTA staff, who then routinely obtain information from carrier

25   members that transport the commodity at issue.

26       78.    At its meetings, NMFTA members often discuss "the critical challenges [] facing

27   the LTL industry." NMFTA and the NCC, therefore, presented ample opportunity and cover for

28   discussions, coordination, and the reaching of illicit agreements among Defendants on fuel

1    surcharges. Indeed, shippers have accused the NMFTA and the NCC of representing the
2    interests of LTL carriers to the detriment of shippers, even in performing the classification
3    duties allotted to those organizations. No activity undertaken by Defendants to collude on LTL
4    Fuel Surcharges at meetings held under the auspices of the NMFTA was in any way immunized
5    from antitrust liability.

6        79.    Another forum that provided Defendants the means and opportunity to conspire
7    was the ATA. The ATA is "a federation made up of three unique and separate entities, all
8    working toward one common goal. The Federation consists of: ATA, representing the national
9    interests; the 50 affiliated state trucking associations, representing the state and local interests;
10   and the affiliated councils and conferences, representing specialized areas of the trucking
11   industry." This organization, which also meets regularly, has identified diesel fuel costs as a
12   "priority issue."

13                        **ADDITIONAL EVIDENCE OF CONSPIRACY**

14       80.    Additional factors further support the allegation that Defendants agreed to fix
15   prices for LTL Fuel Surcharges. The LTL freight transportation industry is marked by certain
16   structural and other characteristics that make a price-fixing cartel feasible.

17       81.    *History of anticompetitive conduct.* As discussed, the LTL trucking industry is
18   marked by a history of regulation that facilitated conduct considered anticompetitive under the
19   antitrust laws. Such a history has made it more likely that participants in the industry would
20   engage in non-immunized conduct involving anticompetitive cooperation among competitors.

21       82.    *Use of a third-party conduit to share information among Defendants.* Another
22   organization that has facilitated the alleged conspiracy through the sharing of information is a
23   private company called SMC³. As stated at its website, "[f]ounded in 1935, SMC³ has built a
24   reputation among industry professionals as a central knowledge base for decision support,
25   improved collaboration and streamlined processes in the movement of freight via motor
26   carriers." In addition to hosting industry gatherings at which representatives of Defendants can
27   meet and conspire, the company has shared information from and to its LTL customers on how
28   to deal with rising fuel costs. None of this activity is immunized from antitrust liability.

83.   *Industry concentration.*  As noted above, the LTL carrier industry is highly concentrated as a result of various mergers, acquisitions or deals, such as: Con-Way's acquisition of Penn Yan Express, Inc.; American Capital Strategies' acquisitions of Service Transport, Inc. and Dixie Trucking Co, Inc.; the merger of Yellow Corporation and Roadway Corporation to create YRC; Fedex's acquisition of Caliber Systems, Inc.;  the creation of Ryder/P.I.E. Nationwide, Inc.; and the Helms-Burns three-way end-to-end deal.  Such high concentration facilitates the creation and success of a price-fixing cartel.

84.   *Significant barriers to entry.*  In the LTL sector, substantial amounts of capital are required for a network of service facilities, shipment-handling equipment, and revenue equipment (for city pick-up, delivery, and linehaul).  Necessary investments in a hub of terminals are costly, take time to develop, and require regulatory and reviews and approval.  It has also become increasingly difficult to build LTL truck terminals.  Carriers must be able to forecast demand five years in advance, so that site selection, local approvals, and construction can be completed when needed.  In addition, investment in effective information technology has become increasingly important in the LTL segment, largely due to the number of transactions and customers served on a daily basis.  Finding qualified drivers is also a challenge.  Entry is thus both expensive and risky, which is why no new company of significant size has entered the LTL market recently – except by acquiring existing companies.  Such high barriers to entry facilitated Defendants' maintenance of their conspiracy.  As noted in the 2006 FMCSA report cited earlier: "[t]he larger carriers have a better position to dictate terms to shippers, as only the larger firms have the capacity to handle the needs of large clients.  This economy of scale limits the entrance of new, smaller competitors that could drive down the fuel surcharges and rates.  Therefore, it is unlikely that the surcharges will go away entirely."

85.   *Surcharge standardization.*  Defendants structured their LTL Fuel Surcharges as a percentage of base rates.  Uniform and homogeneous products – such as the surcharges – are more susceptible to price-fixing.

86.   *Surcharge publication.*  Defendants published their surcharge percentages on their websites so they could police the conspiracy without frequent communications.

87.    ***Significance of price.***    Price is the most significant factor in LTL freight transportation, which facilitates price fixing.

88.    ***Use of unlawful surcharges by other types of freight carriers.***    The Defendants' use of unlawful LTL Fuel Surcharges also should be considered in the context of similar unlawful uses of fuel surcharges by other types of carriers with whom Defendants engage in intermodal operations.  For example, the United States Department of Justice ("DOJ") recently fined Korean Air Lines $300 million for, *inter alia*, price fixing of cargo transportation rates, including fuel surcharges.  Lufthansa, a German airline, is cooperating with the DOJ and other international antitrust enforcement authorities concerning conspiracies in the airline industry to, *inter alia*, fix fuel surcharges on air cargo shipments.

89.    Likewise, in January of 2007, the STB prohibited railroads, with whom Defendants also engage in intermodal operations, from computing fuel surcharges on regulated rail traffic in an unreasonable manner.  In its press release announcing a final rule on this topic, the STB said:

> The Surface Transportation Board today concluded its inquiry into railroad fuel surcharge practices by issuing a final rule declaring it an unreasonable practice for railroads to compute fuel surcharges in a manner that does not correlate with actual fuel costs for specific rail shipments. In its decision, the STB prohibits the assessment of fuel surcharges based on a percentage calculation of the base rate charged to freight railroad customers. The decision also prohibits 'double-dipping'--applying to the same traffic both a fuel surcharge and a rate increase based on a cost index that includes a fuel component. Finally, the Board is proceeding with a proposal to monitor the fuel surcharge practices of the rail industry by imposing mandatory reporting requirements on all large (Class I) railroads.

> In announcing today's decision, STB Chairman Charles D. Nottingham said:

> **"Our decision today brings common sense and fairness to the railroads' implementation of fuel surcharges. This new rule will preclude them from selectively imposing surcharges in a manner that bears little relationship to actual fuel use. It will also remove the possibility that railroads will view fuel surcharges as a profit center."** (Emphases in original.)

## INTERSTATE TRADE AND COMMERCE

90.    Defendants transported over 88% of cargo by value within all regions of the United States and other parts of North America.

91.    The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce.   During the Class Period, Defendants and their co-conspirators sold and carried out LTL freight shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States.  Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce, or both, to sell and market LTL freight transportation services. The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

92.    The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a.    The LTL Fuel Surcharges paid by Plaintiff and members of the Class were fixed, inflated, or stabilized at supracompetitive levels; and

b.    Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for LTL freight transportation.

93.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property.  The injury sustained by the Plaintiff and the Class is the payment of supracompetitive prices for LTL Fuel Surcharges as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

//

//

//

## COUNT I
### (Violation of § 1 of the Sherman Act and § 4 of the Clayton Act)

94.    Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

95.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

96.    The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for LTL Fuel Surcharges for LTL freight transportation.

97.    As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supracompetitive prices during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

A.    That the Court certify this case as a class action under Rules 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

C.    That the Court enter judgment against Defendants, jointly and severally, in an amount equal to three times the amount of damages the Class has sustained because of Defendants' actions;

D.    That Plaintiff be awarded all costs incurred, including reasonable attorneys' fees, as well as pre-judgment and post-judgment interest;

E.    That a trial by jury be held on all issues; and

1    F.    That Plaintiff receive any other relief, at law and/or equity, the Court deems

2          appropriate.

3                        **DEMAND FOR JURY TRIAL**

4    Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as

5    to all issues triable by a jury.

6    DATED: November 2, 2007                      Respectfully submitted by:

7                                                 GERGOSIAN & GRALEWSKI LLP
                                                  Edward M. Gergosian
8                                                 Robert J. Gralewski, Jr.
                                                  Clarissa E. Riley
9

10   *Robert J. Gralewski with permission ADR*
                                                  Robert J. Gralewski, Jr.

11
                                                  655 West Broadway, Suite 1410
12                                                San Diego, CA 92101

13                                                HEINS MILLS & OLSON P.L.C.
                                                  Vincent J. Esades
14                                                Scott W. Carlson
                                                  3550 IDS Center
15                                                80 South Eighth Street
                                                  Minneapolis, MN 55402
16
                                                  Christian M. Sande, #026474X
17                                                CHRISTIAN SANDE LLC
                                                  2751 Hennepin Avenue South, No. 232
18                                                Minneapolis, MN 55408-1002

19                                                Attorneys for Plaintiff

20

21

22

23

24

25

26

27

28

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

## # 144130    — SR

## November 02, 2007
## 15:17:56

## Civ Fil Non-Pris

USAO #.: 07CV2103 CIV. FIL.
Judge..: M. JAMES LORENZ
Amount.:                    $350.00 CK
Check#.: BC#5716

Total—>   $350.00

FROM: JAWORSKI V. ARKANSAS BEST
      CORP.
      CIVIL FILING

JS44
(Rev. 07/89)

## CIVIL COVER SHEET

The JS-44 civil sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM)

**I (a) PLAINTIFFS**

WILLIAM R. JAWORSKI, d/b/a GREAT NORTHERN ENGINEERING, on behalf of himself and all others similarly situated,

**DEFENDANTS**

ARKANSAS BEST CORPORATION, ABF FREIGHT SYSTEM, INC., AVERITT EXPRESS, INC., CON-WAY INC., CON-WAY FREIGHT, INC., ESTES EXPRESS LINES, FEDEX CORPORATION, OLD DOMINION FREIGHT LINE, INC., SAIA, INC., SMITHWAY MOTOR FREIGHT LINE LLC, UNITED PARCEL SERVICE, INC., and YRC WORLDWIDE, INC.,

FILED

07 NOV -2 PM 3:16

CLERK, U.S. DISTRICT COURT
SOUTHERN DIST. OF CALIFORNIA

BY _____ DEPUTY

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**    State of Minnesota
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Robert J. Gralewski, Jr.
GERGOSIAN & GRALEWSKI LLP
655 West Broadway, Suite 1410
San Diego, CA 92101
(619) 237-9500

**ATTORNEYS (IF KNOWN)**

'07 CV 2103 L (AJB)

**II. BASIS OF JURISDICTION** (PLACE AN X IN ONE BOX ONLY)

- 1 U.S. Government Plaintiff
- **X** 3 Federal Question (U.S. Government Not a Party)
- 2 U.S. Government Defendant
- 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 5 | 6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. §15). Plaintiff brings this antitrust class action alleging the Defendant companies conspired to fix, raise, maintain and stabilize prices of fuel charges added to their customers' bills.

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| • 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | • 610 Agriculture | • 422 Appeal 28 USC 158 | • 110 400 State Reappointment |
| • 120 Marine | • 310 Airplane | • 362 Personal Injury-Medical Malpractice | • 620 Other Food & Drug | • 423 Withdrawal 28 USC 157 | **X** 10 Antitrust |
| • 130 Miller Act | • 315 Airplane Product Liability | • 365 Personal Injury-Product Liability | • 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | • 430 Banks and Banking |
| • 140 Negotiable Instrument | • 320 Assault, Libel & Slander | | • 630 Liquor Laws | • 820 Copyrights | • 450 Commerce/ICC Rates/etc. |
| • 150 Recovery of Overpayment &Enforcement of Judgment | • 330 Federal Employers' Liability | • 368 Asbestos Personal Injury Product Liability | • 640 RR & Truck | • 830 Patent | • 460 Deportation |
| • 151 Medicare Act | • 340 Marine | **PERSONAL PROPERTY** | • 650 Airline Regs | • 840 Trademark | • 470 Racketeer Influenced and Corrupt Organizations |
| • 152 Recovery of Defaulted Student Loans (Excl. Veterans) | • 345 Marine Product Liability | • 370 Other Fraud | • 660 Occupational Safety/Health | **SOCIAL SECURITY** | • 810 Selective Service |
| • 153Recovery of Overpayment of Veterans Benefits | • 350 Motor Vehicle | • 371 Truth in Lending | • 690 Other | • 861 HIA (1395ff) | • 850 Securities/Commodities Exchange |
| • 160 Stockholders Suits | • 355 Motor Vehicle Product Liability | • 380 Other Personal Property Damage | **LABOR** | • 862 Black Lung (923) | • 875 Customer Challenge 12 USC |
| • 190 Other Contract | • 360 Other Personal Injury | • 385 Property Damage Product Liability | • 710 Fair Labor Standards  Act | • 863 DIWC/DIWW (405(g)) | • 891 Agricultural Acts |
| • 195 Contract Product Liability | | | • 720 Labor/Mgmt. Relations | • 864 SSID Title XVI | • 892 Economic Stabilization Act |
| | | | • 730 Labor/Mgmt. Reporting & Disclosure Act | • 865 RSI (405(G)) | • 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | • 740 Railway Labor Act | **FEDERAL TAX SUITS** | • 894 Energy Allocation Act |
| • 210 Land Condemnation | • 441 Voting | • 510 Motions to Vacate Sentence Habeas Corpus | • 790 Other Labor Litigation | • 870 Taxes (U.S. Plaintiff or Defendant) | • 895 Freedom of Information Act |
| • 220 Foreclosure | • 442 Employment | | • 791 Empl Ret. Inc. Security Act | • 871 IRS – Third Party 26 USC 7609 | • 900 Appeal of Fee Determination Under Equal Access to Justice |
| • 230 Rent Lease & Ejectment | • 443 Housing/Accommodations | • 530 General | | | • 950 Constitutionality of State |
| • 240 Tort to Land | • Welfare | • 535 Death Penalty | | | • 890 Other Statutory Actions |
| • 245 Tort to Product Liability | • Other Civil Rights | • 540 Mandamus & Other | | | |
| • 290 All Other Real Property | | • 550 Civil Rights | | | |
| | | • 555 Prisoner Conditions | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)
**X** 1 Original Proceeding   • 2 Removal from State Court   • 3 Remanded from Appellate Court   • 4 Reinstated or Reopened   • 5 Transferred from another district (specify)   • 6 Multidistrict Litigation   • 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**   **X** CHECK IF THIS IS A CLASS ACTION UNDER F.r.c.p. 23    DEMAND $    Check YES only if demanded in complaint:   JURY DEMAND: **X** YES • NO

**VIII. RELATED CASE(S) IF ANY (See Instructions): JUDGE**        Docket Number

DATE November 2, 2007        SIGNATURE OF ATTORNEY OF RECORD   Robert J. Gralewski, with permission AJK

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

# 144130 11/2/07 AV $ 350.